**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| **CAROLYN MODICA,** | § | |
| | § | |
| **v.** | § | **A-02-CA-722 AWA** |
| | § | |
| **ANTOINETTE HUMPHREY** | § | |

<u>**MEMORANDUM OPINION & ORDER**</u>

Before the Court is Defendant Humphrey's Motion for Summary Judgment (Clerk's Doc. No. 123). Modica brought this suit in 2002. This Court issued an order on a previous summary judgment claim, which was affirmed in part, and reversed in part on an interlocutory appeal to the Fifth Circuit. The Circuit's mandate was issued April 5, 2007. The Court held a status conference on April 30, 2007, and entered a scheduling order calling for trial on October 9, 2007. On June 25, 2007, Humphrey filed this motion for summary judgment arguing that she is entitled to qualified immunity on Modica's claim. The Court held a hearing on the motion on August 29, 2007.

## I. BACKGROUND

The facts of this case have been set out in two previous opinions, *see Modica v. Taylor*, No. A-02-CA-722 AWA (Clerk's Doc. No. 101), and *Modica v. Taylor*, 465 F.3d 174 (5th Cir. 2006), therefore, only the briefest recitation of the facts is needed here.

The only remaining claim left in this case is Modica's § 1983 First Amendment retaliation claim against Defendant Antoinette Humphrey. Boiled down to its essence, Modica claims that she was retaliated against during Humphrey's tenure as Executive Director at the Texas Cosmetology Commission (TCC) – an agency since abolished by the Texas legislature – for exercising her First Amendment rights (Modica was employed as an inspector). Modica sent a letter to a state legislator who served on the committee with oversight over the TCC, complaining of problems with the agency

(*e.g.*, misuse of public funds).   After a meeting regarding Modica's complaints – attended by the state representative, Modica, and Humphrey – Modica claims that Humphrey began retaliating against her at work by, for example, micro-managing her schedule, and giving her an unusual amount of assignments that required travel.

Humphrey contends that she is entitled to qualified immunity on this claim because Modica's claim is barred by the Supreme Court's decision in *Garcetti v. Ceballos*, 126 S. Ct. 1951 (2006), and thus Modica cannot establish a constitutional violation.   She alternatively claims that *Garcetti* demonstrates that Modica's constitutional right to employment without retaliation for First Amendment activities was not clearly established at the time Humphrey took actions against Modica in 2002 and 2003.[1]

## II. ANALYSIS

To determine whether an official is entitled to qualified immunity from a suit alleging a constitutional violation, the Court conducts the familiar two-step inquiry.   First, the Court asks whether the plaintiff has alleged facts to establish that the official violated the plaintiff's constitutional rights.   *Hope v. Pelzer*, 536 U.S. 730, 736 (2002) ("The threshold inquiry a court must undertake in a qualified immunity analysis is whether plaintiff's allegations, if true, establish a constitutional violation.").   Whether the facts establish a violation of a constitutional right is determined with reference to current law.   *See Atteberry v. Nocona Gen. Hosp.*, 430 F.3d 245, 253 (5th Cir.2005).   If the facts do not establish that the defendant violated the plaintiff's constitutional rights, the Court need not inquire further.   If the facts do so establish, the defendant is still entitled

---

[1]*Garcetti* was decided before the Fifth Circuit issued its decision in this case, and well before it issued its mandate.   Unfortunately, neither the parties nor the Circuit raised the *Garcetti* issue while the case was on appeal.

to qualified immunity unless the court finds that the defendant's conduct was objectively unreasonable in light of clearly established law at the time of the state actions at issue. *Breen v. Texas A&M Univ.*, 485 F.3d 325, 332 (5th Cir. 2007).

## A.     Constitutional Violation

The first issue, then, is whether the rule governing public employee speech rights – as established in *Garcetti v. Ceballos*, 126 S. Ct. 1951 (2006), and elucidated by an even more recent Fifth Circuit case interpreting *Garcetti*, *Williams v. Dallas Independent School Dist.*, 480 F.3d 689 (5th Cir. 2007) – controls the disposition of the first part of the qualified immunity inquiry.

*Garcetti* held that the threshold inquiry in any public employee free speech case is whether the speech at issue was made "pursuant to the employee's official duties."  126 S.Ct. at 1960 ("We hold that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline").  The Court refused to define with specificity what "official duties" constituted, but noted that neither formal, written job descriptions nor speaking "concerning the subject matter of [one's] employment" are dispositive to the inquiry.  *Id*. at 1959-1961.  The majority was at pains to note that they did not intend to eviscerate public employees' free speech rights, and pointed to the *Pickering* line of public employee speech cases as providing pertinent examples of protected speech by public employees.  *See Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty.*, 391 U.S. 563 (1968) (holding that teacher's letter to a local newspaper addressing issues including the funding policies of his school board was protected speech); *see also Givhan v. Western Line Consol. Sch. Dist.*, 439 U.S. 410 (1979) (holding that Givhan's complaints to her principal about school's discriminatory hiring  practices was protected

3

speech); *Connick.v. Myers*, 461 U.S. 138 (1983) (portion of assistant district attorney's questionnaire that asked colleagues whether they felt pressure to work on political campaigns was protected speech).

In *Williams*, the Fifth Circuit applied *Garcetti* to these facts: Williams was the athletic director and head football coach at a Dallas area high school. After numerous failed attempts to determine the level of funds that were in the school's athletic budget, Williams wrote a memo to the school's principal detailing the issues he had been facing regarding the lack of funds in the school's athletic account (funds that otherwise should have been there). *Williams*, 480 F.3d at 690-91. The school principal promptly fired Williams. The principal, however, was later put on administrative leave "pending an investigation of matters including 'financial accountability.'" *Id*. at 691. Williams sued, contending that his First Amendment rights had been violated. The Fifth Circuit disagreed, noting that "[u]nder Garcetti, we must shift our focus from the content of the speech to *the role the speaker occupied* when he said it." *Id* (emphasis added). Surveying the field of relevant case law, the Court discerned that the key distinction was "between speech that is the kind of activity engaged in by citizens who do not work for the government . . . and activities undertaken in the course of performing one's job." *Id*. at 693. In other words, "[a]ctivities undertaken in the course of performing one's job are activities pursuant to official duties." *Id*.

The *Williams* Court found the fact that Williams's memoranda, while not a *required* part of his job, dealt with the daily internal operations of the athletic department's account and purchases, budget, and supplies related to his role as athletic director and football coach. *Id*. at 694. The Court also relied on other circuit court decisions dealing with public employee speech rights post-*Garcetti*. For example, the Ninth Circuit in *Freitag v. Ayers*, took up whether a corrections officer's

4

communications with a state senator and the state office of the inspector general concerning an atmosphere of sexual misconduct and harassment by male prisoners (after the department of corrections had repeatedly failed to address her concerns) constituted protected speech after *Garcetti*. 468 F.3d 528, 544-45 (9th Cir. 2006) The *Freitag* Court stated: "We think it clear that these communications are protected under the First Amendment." *Id*. at 545.[2]

Here, Modica sent a letter to Texas State Representative Roberto Gutierrez accusing the TCC and Holifield – then the director of TCC – of the following: (1) "cheating on numbers to make performance levels higher;" (2) eliminating the tracking system for complaints; (3) abusing travel expenses; (4) misusing state funds; (5) permitting inappropriate activities in the workplace; (6) failing to make the "law books" sold to the public consistent; (7) harassing and abusive conduct, and preferential treatment of schools found to be violating state regulations; and (8) failing to hold administrative hearings to collect outstanding fines.

To paraphrase the title of a children's song: one of these precedents is not like the other (or, perhaps, like our facts). That is to say, *Williams* is easily distinguishable because the memorandum was internal, directed to the employee's supervisor, and concerned issues that were relevant *only* to the inner-workings of the school. *Freitag*'s communications were external, directed to an oversight agency and elected official, and involved alleged misconduct that had not been remedied in response to internal communications. Modica's circumstances are nearly identical to those in *Freitag*.

---

[2]The *Williams* Court also cited to an Eleventh Circuit case where a university employee in the financial aid department reported possible mishandling of funds to university administration. *Battle v. Bd. of Regents for Georgia*, 468 F.3d 755 (11th Cir. 2006). She was later informed that her contract would not be renewed. *Id*. at 758. After she sued, the court of appeals found that her reporting of financial improprieties to university officials was within the scope her employment responsibilities, therefore her speech was not protected. *Id*. at 761.

Modica's internal complaints were ignored, so she took her grievances to a state legislator. Moreover, it is beyond dispute – as both this Court found and the Fifth Circuit held – that a number of Modica's complaints involved matters of public concern. *See Modica v. Taylor*. No. A-02-CA-722 AWA (Clerk's Doc. No. 101) and *Modica v. Taylor*, 465 F.3d 174, 181-82 (5th Cir. 2006); *see also Garcetti*, 126 S. Ct. at 1958-59 (reviewing public employee speech cases and noting that the "Court's decisions, then, have sought both to promote the individual and societal interests that are served when employees speak as citizens on matters of public concern").

At the hearing, Humphrey made heavy weather of Modica's job description, listing aspects of the description such as "preparing correspondence and reports."  Humphrey hones in on this point in spite of the fact that the *Garcetti* majority explicitly noted that:

> [f]ormal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes.

*Garcetti*, 126 S.Ct. at 1962.  The rationale was, of course, to combat against the possibility that employers would give an unusually large scope to an employee's job description in order to make most any communication a *de facto* part of their job responsibilities.  *See id*. at 1961-62 (responding to the dissent's worry of this very response by employers and stating that "[t]he proper inquiry is a practical one.").  Not extending protection here would effectively eviscerate Plaintiff's free speech rights.  For if the Court were to read "correspondence" in the broad manner that Humphrey advocates there would literally be nothing Modica could reduce to writing that would *not* be "correspondence" of some sort, and which would therefore fall within her "official" job duties.  This is not what the *Garcetti* majority intended and, consequently, the Court refuses to start down that path.

Humphrey also emphasized two other points at the hearing.  First, she pointed out that Modica characterized her letter to the state legislature as detailing her concerns regarding the Commission's "mode of operations."  *See* Plaintiff's Response, Exh. B.  By itself, this proves nothing.  The same – that the speech concerned the defendant's mode of operations – could be said of the public employee's protected speech in *Freitag, Pickering*, and *Givhan*. *See Pickering*, 391 U.S. 563 (holding that teacher's letter to a local newspaper addressing issues including the funding policies of his school board was protected speech); *Givhan*, 439 U.S. 410 (holding that Givhan's complaints to her principal about school's discriminatory hiring  practices was protected speech); *Freitag*, 468 F.3d at 544-45.

Second, Humphrey argued that the Court was perhaps too focused on the "target" of Modica's speech (Representative Guitierrez) and that *that* is not dispositive to the inquiry.  The Court of course agrees that it is not dispositive – no single factor, standing alone, is – but is puzzled at the implication of the argument.  The fact that it is not dispositive of the issue, does not mean that it is not important.  Plainly, where a public employee targets their speech has much to do with determining whether the speech was a "statement[ ] pursuant to their official duties." *Garcetti*,  126 S.Ct. at 1960.  Gil Garcetti's speech was not protected because it directly involved his work *and* because it was targeted at his superiors. *Garcetti*, 126 S. Ct. at 1951.  Similarly, Gregory William's speech was not protected given its target (the school principal, his supervisor). *Williams*, 480 F.3d at 689.  One reason Deanna Freitag's speech *was* protected was its target (a watchdog agency and a legislator). *Freitag*, 468 F.3d at 528.  If the Court were to ignore the target of Modica's speech it would be, almost by definition, abjuring its responsibilities in conducting the practical inquiry directed by *Garcetti*.

7

Given the above, the Court finds that Modica's speech was protected even under *Garcetti* and she has satisfied the first prong of the qualified immunity test by showing that her constitutional rights were violated.

## B.     Clearly Established

Humphrey also contends that *Garcetti* impacts the second prong of the analysis: whether Modica's right was clearly established at the time of Humphrey's conduct.  As noted above, government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  *McClendon v. City of Columbia*, 305 F.3d 314, 327 (5th Cir. 2002).  What this means in practice is that whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful action generally turns on the "objective legal reasonableness" of the official's action, assessed in light of the legal rules that were clearly established at the time it was taken."  *Id.* In other words,

> the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful . . . but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

In her motion, Humphrey contends, with little analysis, that "the law governing [Modica's] complaint was demonstratively [sic] unclear" at the time of the adverse acts, and she is therefore entitled to qualified immunity.  *See* Defendant's Motion for Summary Judgment at 14 (Clerk's Doc. No. 123).  This, however, is demonstrably wrong.  At the time of Modica's termination, the law regarding public employees' First Amendment rights was well-established, by *Pickering*, *Givhan*,

8

and many other Supreme Court and appellate court decisions.  All that *Garcetti* did was to reduce the class of plaintiffs who can prevail on such claims by making it clear that only public employees who are speaking *outside* of their official duties may bring retaliation claims.  It otherwise did not change the general rule, set out in *Pickering* and countless other cases, that it is unlawful to terminate an employee for exercising their First Amendment rights.  In other words, given the facts of this case, Humphrey cannot plausibly contend that she relied on law existing at the time she took actions against Modica, and then that law was changed by *Garcetti* to her detriment.  Indeed, it is quite the opposite; Humphrey filed the instant motion because she contends that *Garcetti* changed the law in a manner favorable to her (*i.e.*, to *eliminate* the Plaintiff's claim).  Because *Garcetti* narrowed the class of people who may sue under the First Amendment, but that narrowing did not eliminate Modica's claim, nothing about the change affected by *Garcetti* is relevant to the question of whether Modica's right infringed upon by her harassment and firing was "clearly established" at the time it took place.

In a corollary to this argument, Humphrey contended at the hearing that in determining whether Modica's First Amendment right was clearly established, the Court must look to what happened in the law *after* the complained of actions.  That is, she contends that her conduct in 2002-03 should be judged by the standard laid out in *Garcetti*.  This argument is, at best, mysterious and is inconsistent with legions of § 1983 cases.  It is an axiomatic feature of § 1983 law that "the court must consider whether the [defendant's] conduct was objectively unreasonable in the light of the clearly established law *at the time of the incident*."  *Stokes v. Gann*, ---- F.3d ----, 2008 WL 2429726, per curiam (5th Cir. Aug. 29, 2007) (emphasis added).  The retroactivity argument is a function of

Humphrey's wishful thinking rather than having any basis in law or fact.[3]  Regardless, as set forth in the first section, *Garcetti* does not bar this claim, because Modica's speech was not made "pursuant to [her] official duties."  126 S.Ct. at 1960

In the end, the question posed by this case is whether retaliating against an employee for exercising her speech rights was clearly established at the time of Humphrey's acts.  One need only take a quick glance at *Garcetti* to determine that such a right was in fact clearly established.  In fact, the first sentence of that opinion makes this point indisputable.  Justice Kennedy begins his opinion by stating: "It is *well settled* that 'a State cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression.'"  *Garcetti*, 126 S.Ct. at 1955 (emphasis added) (quoting *Connick v. Myers*, 461 U.S. 138, 142 (1983)).  There can be little better proof of the flaw in Humphrey's argument on this point.  Accordingly, Modica has

---

[3] *Brousseau v. Haugen*, 543 U.S. 194, 199 (2004) ("We therefore turn to ask whether, *at the time of Brosseau's actions*, it was clearly established in this more particularized sense that she was violating Haugen's Fourth Amendment right) (emphasis added); *Wilson v. Layne*, 526 U.S. 603, 614 (1999) ("Since the police action in this case violated petitioners' Fourth Amendment right, we now must decide whether this right was clearly established *at the time of the search*.") (emphasis added); *Hanlon v. Berger*, 526 U.S. 808 (1999) (holding that government agents were entitled to qualified immunity since the law in this regard was clearly established *at the time of the challenged search*) (emphasis added); *County of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998) (after finding that constitutional violation occurred, "court should ask whether the right allegedly implicated was clearly established *at the time of the events in question*") (emphasis added); *Rodis v. City and County of San Francisco*, ---- F.3d ----, 2007 WL 2421417, *5 (9th Cir. Aug. 28, 2007) ("*At the time of [defendant's] arrest*, it was clearly established that evidence of intent was required to establish probable cause) (emphasis added); *Jennings v. Jones*, ---- F.3d ---- 2007 WL 2339195, (1st Cir. Aug. 17, 2007) ("we find that this right was clearly established *at the time of Jennings' injury*") (emphasis added); *Van Deelan v. Johnson*, ---- F.3d ----, 2007 WL 2309778, at *5 (10 th Cir. Aug. 14, 2007) (after establishing constitutional violation we determine whether "right at issue was clearly established *at the time of the defendant's allegedly unlawful conduct*") (emphasis added); *Lowery v. Euverard*, ---- F.3d ----, 2007 WL 2213215, at *2 (6th Cir. Aug. 3., 2007) ("the Court must determine if the right was clearly established *at the time of the violation*.") (emphasis added).

satisfied the second prong of the qualified immunity test, and Humphrey is not entitled to qualified immunity as a result of the *Garcetti* decision and its recent progeny.

### III.  CONCLUSION

For the reasons set forth above, Defendant Humphrey's Motion for Summary Judgment (Clerk's Doc. No. 123) is **DENIED.**

SIGNED this 21st day of September, 2007.

_____

ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE